AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of Delaware

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| | ) | Case No. |
| DONTE JACOBS | ) | 19 - 193 |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __June 21, 2016 to June 28, 2016__ in the county of __New Castle__ in the _____ District of __Delaware__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 1. 21 U.S.C. § 841(a)(1) and (b)(1)(C) | Between June 21, 2016 and June 28, 2016, Donte JACOBS distributed a mixture of substance, containing a detectable amount of fentanyl in violation of Title 21, United Sates Code, Sections 841(a)(1), and (b)(1)(C). |

This criminal complaint is based on these facts:
See the attached Affidavit.

FILED
JUL 01 2019
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Trevor Riccobon, TFO, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/01/19

_____
*Judge's signature*

City and state: Wilmington, Delaware

Hon. Christopher J. Burke, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AGAINST DONTE JACOBS

1. I, Trevor Riccobon, am a law enforcement officer of the United States within the meaning of Title 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516. During my law enforcement tenure, I have participated in several investigations into the unlawful distribution of narcotics in violation of federal and state laws that have led to arrests, convictions of violators and seizures of narcotics and proceeds gained from illegal activity. In the course of my duties, I have conducted or participated in physical surveillance, the execution of search warrants, debriefings of informants, interviews of witnesses, and reviews of recorded conversations involving drug trafficking activities. I have received several hundred hours of training in various investigative techniques; to include: controlled dangerous substance identification, the methods and means of narcotics violators, narcotics packaging, narcotics paraphernalia, terminology, prices, field testing, interview and interrogation techniques, surveillance techniques, undercover operations, confidential source management, and the effects of controlled dangerous substances on abusers. Through my training, education and experience, I have become familiar with the identification of illegal drugs, methods in which illegal drugs are imported, manufactured and distributed; the methods of payment for such drugs; and the methods used by drug traffickers to avoid law enforcement detection, including disguising the source and illegal nature of drug proceeds. I continue to keep abreast of current trends and practices of drug traffickers by reading periodicals, intelligence briefs, and training literature. Additionally, I maintain daily contact with other federal and state law enforcement personnel, confidential sources, cooperating defendants, and sources of information to remain up to date with current trends of drug traffickers.

2. Through my training and experience, as well as the training and experience of other law enforcement officers involved in this investigation, your affiant knows:

- Heroin is a Schedule I narcotic controlled substance;
- Fentanyl is a Schedule II narcotic controlled substance;

3. The statements contained in this affidavit are based on my personal knowledge, information provided by law enforcement officers, information provided by cooperating defendant sources, and on my experience and background as a law enforcement officer and TFO with the DEA Wilmington Residential Office (WRO). Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.

## FACTS OF THE INVESTIGATION ESTABLISHING PROBABLE CAUSE

4. On June 29, 2016, Detective Sergeant Keith Cowdright of the New Garden Township Police Department ("NGPD") (located in Pennsylvania) began investigating the death of a female with the initials "TA." The female's identity is known to your affiant, but being withheld for the protection of a cooperating witness. TA was found in her bedroom sitting next to the bed with a tourniquet on her arm, a needle on the floor next to her, and two (2) empty suspected heroin baggies labeled "BUTTER." Detective Sergeant Keith Cowdright located a cellular telephone utilized by TA on the bed adjacent to where she was found. This cellular telephone was primarily utilized by TA but belonged to TA's boyfriend, hereinafter referred to as coopering witness ("CW"). Detective Sergeant Cowdright located approximately four (4) bundles (fifty-two (52) baggies) of suspected heroin also labeled "BUTTER" in TA's purse located next to her.

2

Laboratory for heroin and for fentanyl were conducted on the powder inside the baggies at Lima Regional Laboratory. The powder substance inside the bags contains both heroin and fentanyl.

5. Your Affiant is aware that on October 4, 2016, a forensic toxicologist, Dr. Michael Coyer, issued a report finding that TA died of a fentanyl overdose. TA had 26 ng/ml of fentanyl in her post-mortem blood, which is well above therapeutic levels. Dr. Coyer opined that TA's death is consistent with the ingestion of the substance in the "BUTTER" stamped bags.

6. Detective Sergeant Keith Cowdright interviewed the CW and learned that TA used approximately five (5) bundles (sixty-five (65) baggies) of heroin every day. The CW advised that the CW doesn't use illegal drugs and has been trying to get TA to stop using heroin for some time. The CW advised that TA used heroin daily for the last three (3) years and the CW further stated that the TA purchased all of her heroin from a black male in Delaware. This individual known to the CW, is fully identified to your affiant, and is hereinafter referred to as Cooperating Defendant ("CD") because he/she later cooperated with law enforcement.

7. On June 29, 2016, the NGPD requested the assistance of the DEA in furtherance of the investigation. SA Robert A. Johnson ("SA Johnson") and Detective Sergeant Cowdright reviewed TA's cellular telephone and identified text messages between the CW and TA, and between TA and the CD, which are consistent with TA arranging the purchase of heroin from the CD on June 28, 2016.

8. On June 30, 2016, and at the direction of SA Johnson, the CW sent the CD a series of text messages arranging the purchase of heroin under the ruse of acquiring the heroin for TA. The CD agreed to meet the CW at the Christiana Mall. The CW and the CW's vehicle were searched for the presence of contraband or illegal drugs with negative results and the CW was

provided with $320 and a concealed recording device. The CW then traveled under visual surveillance to the Christiana Mall and awaited the CD's arrival. A short time later, the CD arrived operating the CD's vehicle. The CD parked directly next to the CW, exited the CD's vehicle, and entered the front passenger door of the CW's vehicle. While inside the CW's vehicle, the CW informed the CD that TA was sick and specifically requested the same heroin that the CD provided TA on June 28, 2016. The CD acknowledged that the heroin the CD brought for the CW was the same heroin the CD provided to TA at that time. The CD then provided the CW with five (5) bundles (sixty-five (65) baggies) of suspected heroin in exchange for the money the CW received from SA Johnson. The CD was then arrested by agents and officers and transported to the DEA Office where the CD's arrest was processed. The suspected heroin seized from the CD was labeled "BUTTER" and processed according to DEA policies and procedures, including field testing the suspected heroin for the presence of heroin and the presence of fentanyl. The powder substance field tested positive for fentanyl and negative for heroin.

9. TFO Giallombardo, Detective Sergeant Cowdright, and SA Johnson, interviewed the CD at the Wilmington Resident Office. The CD's interview was audio and video recorded. Before questioning the CD, SA Johnson provided his verbal and written Miranda warnings. The CD acknowledged his Miranda warnings and signed the Miranda warning form and elected to answer questions. During this recorded interview, the CD admitted to providing TA five (5) bundles of heroin labeled "BUTTER" the night before TA was found dead. That night TA met with the CD on Wildfire Lane in New Castle, Delaware and provided the CD $200 United States Currency in exchange for the five (5) bundles of heroin. The CD also admitted to delivering five (5) bundles of heroin to the CW in exchange for United States Currency just prior to his/her arrest.

4

The CD was asked was asked where the heroin came from that the CD provided to TA. The CD advised that the CD's heroin source of supply was Donte JACOBS ("JACOBS"). SA Johnson provided a photograph of JACOBS and showed it to the CD. The CD immediately recognized the photograph as JACOBS. The CD advised that JACOBS was the CD's heroin source of supply for the last several months and that JACOBS delivered approximately fifty (50) logs (the equivalent of 500 bundles of heroin or 6,500 heroin baggies) to the CD on approximately a weekly basis. The CD advised that JACOBS would either deliver the heroin to the CD in a dark colored minivan or JACOBS would utilize an Uber car to transport the heroin to the CD. Your affiant knows that Uber is an online car service, accessible from a smartphone, which allows a customer to arrange for a privately owned vehicle to transport the customer from one location to another. The CD further advised that the CW is out of heroin and was expecting to pick up from JACOBS the following morning. SA Johnson asked the CD if JACOBS was the person that provided the CD with the drugs that the CD provided to TA. The CD confirmed that JACOBS provided the CD with a load of heroin earlier that week and that the heroin the CD provided to TA was from JACOBS. The CD further advised that the CD, utilizing different cellular telephones, would communicate with JACOBS to arrange drug transactions. The CD advised that the CD and JACOBS would only communicate through FaceTime conversations when JACOBS was utilizing cellular telephone number 215-500-7543 to conduct drug transactions. The FaceTime app was used in an effort to thwart law enforcement. The CD further advised that the CD and JACOBS would communicate through text messages when JACOBS was utilizing cellular telephone number 267-581-6902 to conduct drug transactions. The CD explained that JACOBS also supplies three (3) other people known to the CD in New Castle, Delaware with shipments of heroin for further

distribution. The CD estimated that each of these three (3) individuals received approximately fifty (50) logs of heroin on a weekly basis.

10. On the same date, June 30, 2016, and at the direction of SA Johnson, the CD placed a recorded FaceTime call to cellular telephone number 215-500-7543, utilized by JACOBS. During this conversation, the CD told JACOBS that the CD needs to "holler at JACOBS tomorrow." JACOBS' clarified, "You need to see me tomorrow?" and the CD responded, "Yeah." The CD then advised JACOBS that someone "checked on that shit," and JACOBS asked, "Somebody else checked on the work?" The CD then responded, "Yeah, that BUTTER shit, dog," and JACOBS asked, "On the BUTTER?" The CD responded, "Yeah that shit was popping." JACOBS then asked, "What they saying?" and, "they died a minute ago right?" The CD then asked, "What's going on with this shit," and JACOBS responded, "shit cool." The CD explained, "That was one of my people," and JACOBS asked, "Oh that was one of your people," and "where have you been meeting them at?" The CD responded, "At the Wawa." JACOBS then asked if the CD met them "with the van" and the CD responded, "No, I always walk." JACOBS then said, "The only time they fuck with someone is if it's fentanyl." JACOBS then asked if the person who died, "was a big spender?" The CD responded, "Yeah," and JACOBS said, "Damn." The CD explained that the CD had been dealing with her for some time. JACOBS then said he was going to check on something and call the CD back. The call then ended. Following this conversation, the CD advised SA Johnson that "checked" means to have checked out or died.

11. At approximately 8:48 p.m., the CD received an incoming recorded FaceTime call from cellular telephone number 215-500-7543, utilized by JACOBS. During this conversation, JACOBS said, "That's crazy because they didn't put none of these jawns on what the name, now

6

that I think about it that shit ain't got nothing in it, know what I'm saying?" The CD asked, "Of what?" JACOBS then explained, "You know how they OD on fentanyl and shit like that," and "they put that shit in there, you know what I'm saying?" The CD asked, "What?" and JACOBS clarified, "They put it in the paper. They only put that shit in the paper when that shit be late, like that fentanyl and shit, mother fuckers dying every day off this shit" and "such and such od'd, such and such od'd." The CD then said, "I'm gonna move different anyway, we already talked about that." JACOBS responded, "What you do is, shit when you pass your people off, you tell them somebody already checked off it." The CD then said, "I just want niggers to get right, you know what I mean, I ain't really worried about that shit I guess." JACOBS responded, "If you think he get right, then help them get right," and the CD said, "That's what I'm trying to figure, do I really want to give it to him, I don't want to give it to someone who isn't going to get right." JACOBS then said, "If you're thinking he's going to get right, I would be like fuck it, give it to him." The CD and JACOBS then discuss JACOBS coordinating the installation of a hidden compartment in the CD's vehicle. They discuss the CD holding off on getting the heroin the CD normally gets, and discussed the CD picking up heroin from JACOBS for another unidentified individual.

12.     In your affiant's training and experience, this conversation is evidence that JACOBS is a heroin dealer. JACOBS and the CD discuss how the victim died from the "BUTTER" stamped heroin, and how she spent a lot of money on heroin with the CD. They discuss fentanyl explicitly, and how it is often the cause of killing people. Your affiant knows that drug dealers often mix fentanyl with their heroin to make it more appealing to the end-user. During the second conversation, JACOBS claims he talked to the person he obtained the drugs from, and stated that he was told that there was no fentanyl in it. The parties discuss again how people are overdosing

7

on fentanyl, and the CD explains that he wants to get away from the current stamp ("I'm gonna move different anyway"). JACOBS encourages the CD to continue to sell, and to spin the overdose as a good thing with his clients.

13. On July 1, 2016, the CD received an incoming audio recorded FaceTime conversation from cellular telephone number 215-500-7543, utilized by JACOBS. During this conversation, JACOBS advised that JACOBS was getting ready to come meet the CD but there was no timeframe provided.

14. On the same date and at the direction of SA Johnson, the CD sent the following unanswered text messages to cellular telephone number 267-581-6902, utilized by JACOBS. The text messages were, "we still doin that today?" and "let me kno cause I had something to do."

15. On the same date, the CD received an incoming call from cellular telephone number 267-581-6902, utilized by JACOBS. This call was answered (but unrecorded due to the unavailability of the recording equipment and instead witnessed by two law enforcement officers) and JACOBS told the CD that he was unsure if he would be able to deliver to him that morning. Ultimately, a heroin/fentanyl deal did not occur between the parties.

16. On July 6, 2016, the Honorable Christopher J. Burke, Magistrate Judge in the District of Delaware, signed a Search Warrant authorizing the collection of Global Positioning System ("GPS") data of both of the aforementioned cellular telephones, utilized by Donte JACOBS, for a period of thirty (30) days. The collection of GPS data of cellular telephone numbers 215-500-7543 and 267-581-6902 began on the same date. The location of cellular telephone number 215-500-7543 has been determined to be located in New Castle County, Delaware and Philadelphia and Delaware Counties, Pennsylvania. Prior to JACOBS' arrest,

described in more detail below, the GPS data for cellular telephone number 215-500-7543 was not accurate enough to determine the exact location of cellular telephone number 215-500-7543; however the GPS pings indicated that cellular telephone number 215-500-7543 is located in the area of 5 Dunning Court, New Castle, Delaware, during the overnight and early morning hours since GPS data collection began. Prior to JACOBS' arrest, the location of cellular telephone number 267-581-6902 was undetermined. SA Johnson contacted AT&T, the service provider for cellular telephone number 267-581-6902, and AT&T advised that cellular telephone number 267-581-6902 is an active phone and an active account and it is likely turned off, preventing AT&T from locating cellular telephone number 267-581-6902.

17. SA Johnson served a duly authorized administrative subpoena to T-Mobile for the subscriber records of cellular telephone number 215-500-7543, utilized by JACOBS. The results of that administrative subpoena reveal that the subscriber of cellular telephone number 215-500-7543 is Dominique D. Williams ("WILLIAMS") at 1911 Blatty Place, Newark, Delaware. The cellular telephone account associated with cellular telephone number 215-500-7543 was established on April 16, 2013, and was active as of July 7, 2016. SA Johnson conducted inquires to open source and law enforcement databases and learned that the residence of 5 Dunning Court, New Castle, Delaware is an address JACOBS's previously identified as JACOBS' residence.

18. SA Johnson served a duly authorized administrative subpoena to Uber Technologies for any Uber customer accounts in the name Donte JACOBS or associated with cellular telephone number 215-500-7543, utilized by JACOBS. As a result of that administrative subpoena to Uber Technologies, SA Johnson learned that an account exists with Uber Technologies in the name of Donte JACOBS and associated to cellular telephone number 215-

500-7543. JACOBS Uber Technologies account was activated on August 9, 2013 and active as of July 8, 2016.

19.     On July 8, 2016, the Honorable Christopher J. Burke, Magistrate Judge in the District of Delaware, signed a Search Warrant authorizing the collection of prospective cellular tower data, pen register data, and the use of a cell site simulator for both of the aforementioned cellular telephones, utilized by Donte JACOBS, for a period of thirty (30) days. The collection of cellular tower data and pen register data of cellular telephone number 215-500-7543 began on July 11, 2016.

20.     Beginning on July 10, 2016, and based upon cellular tower location data and GPS data, SA Johnson determined that cellular telephone number 215-500-7543 was located in the area of 5 Dunning Court, New Castle, Delaware during the overnight and early morning hours.

21.     On July 18, 2016, at approximately 10:40 a.m., physical surveillance was established at 5 Dunning Court, New Castle, Delaware. At approximately 11:30 a.m., SA Johnson observed JACOBS walking from the area of 5 Dunning Court, New Castle, Delaware, and enter a black Nissan sedan, registered to Enterprise Rental Corporation, and depart the area. Although SA Johnson did not see JACOBS leaving directly from the front door, based on the layout of the single family homes in the area, SA Johnson believes that JACOBS left directly from 5 Dunning Court, New Castle, Delaware. Mobile surveillance was established on the Nissan. After confirming that cellular telephone number 215-500-7543 was moving by the GPS ping data and cellular tower data, JACOBS was stopped and arrested. JACOBS was transported to the DEA office and was processed as an arrest. At the time of JACOBS arrest, JACOBS was in possession of cellular telephone number 215-500-7543 (SA Johnson called the phone number and it rang), two (2) other

cellular telephones, and a white piece of paper containing numeric amounts, initials, and coded language. In SA Johnson's opinion, the white piece of paper is commonly referred to as an "owe sheet" and is utilized by JACOBS to keep track of drugs provided to people and who owes what amount of money to JACOBS. The paper shows approximately 25-30 people that JACOBS has conducted drug transactions with.

22. With regards to the two cellular phones with unidentified phone numbers, SA Johnson called 267-581-6902 while both cellular phones were on (when they were located, they were powered on). Neither of the phones rang, leading SA Johnson to believe that neither phone is associated with that phone number.

## CONCLUSION

23. Based upon the aforementioned information, your affiant submits that probable cause exists to believe that:

Between June 21, 2016, and June 28, 2016, Donte JACOBS distributed a mixture or substance, containing a detectable amount of heroin and fentanyl that resulted in the death of TA, in violation of Title 21, United Sates Code, Sections 841(a)(1), and (b)(1)(C).

_____
Trevor Riccobon, TFO
Drug Enforcement Administration

Sworn and subscribed to before me this
15 day of July, 2019.

_____
Christopher J. Burke
United States Magistrate Judge

11