IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,

Respondent/Plaintiff,

v.

DONTE JACOBS,

Movant/Defendant.

Criminal Action No. 19-94-RGA
Civil Action No. 23-407-RGA

---

Robert M. Gamburg, Esq., Gamburg & Benedetto LLC, Philadelphia, Pennsylvania. Attorney for Movant.

Benjamin L. Wallace, United States Attorney, United States Department of Justice, Wilmington, Delaware. Attorney for Respondent.

---

**MEMORANDUM OPINION**

March 12, 2026
Wilmington, Delaware

ANDREWS, UNITED STATES DISTRICT JUDGE:

Through counsel, Movant Donte Jacobs filed a timely Motion to Vacate/Set Aside Sentence pursuant to 28 U.S.C. § 2255. (D.I. 102). The Government filed a Response in Opposition. (D.I. 110). For the reasons that follow, the Court denies the Motion.

## I. FACTUAL AND PROCEDURAL HISTORY

> The last thing Jeffrey Kane remembers before falling asleep in the early hours of June 29, 2016, was his girlfriend, Therisa Ally, sitting cross-legged on the floor by their bed. He heard wax bags being shaken and saw her arms moving like they did when she was preparing her heroin. They had fought earlier that night about her heroin addiction and weren't speaking to each other. He got up from the bed, took an Ambien, and fell asleep.
>
> When he awoke the next morning, Ally was still sitting cross-legged on the floor next to their bed. She was slumped over. He felt her, and then shook her a bit, but she was stiff and cold to the touch. He quickly called 911 and tried to lay her down to perform CPR, but he couldn't maneuver her body into the correct position. When the emergency workers arrived, they found Ally lying on her side at the foot of her bed with a tourniquet wrapped around her right arm. There was no pulse.
>
> After they determined Ally could not be resuscitated, police officers cleared the room and began collecting evidence. Sticking out from the bed, just above Ally's knees, the officers spotted a purple clutch purse. In it they found four bundles of what appeared to be heroin, divided into smaller wax bags bearing an ink stamp butterfly image and the word "Butter." One of the wax packages was later tested at a lab and found to contain a mixture of heroin and fentanyl.
>
> On the floor of the bedroom, the officers found another purse. This red-patterned shoulder bag, described by one officer as "basically a to-go bag for drug users," contained a "bunch of syringes" and nine empty wax packets that were stamped with a skull wearing a Viking helmet. No other "Viking bags" were found in the room.
>
> The police also discovered a small round coin purse in the bedroom, holding nine full bags of drugs packaged in wax packets bearing a stamp of a bulldog wearing a top hat. The lab tested just one of these bags and determined it contained only heroin. There were no empty "Bulldog bags" in the bedroom.

Other drug paraphernalia lay strewn about the room. Two empty Butter bags were torn open on the floor; another 54 empty Butter bags were in the trash can. Near Ally's feet was a used syringe, blue bottle top, and a packet of cigarettes, with one cigarette pulled out and the filter partially removed. A syringe loaded with a brown substance sat on a shelf in the bedroom.

The day after Ally's death, Kane agreed to cooperate with agents and to conduct a controlled purchase of drugs from Jonathan Collins. Collins had been Ally's dealer for about two and a half years, and she had bought five bundles of heroin from him nearly every day. In fact, Ally had bought heroin from him—the Butter brand—the evening of her death. At the meeting, Collins handed Kane five bundles of Butter-stamped heroin. Kane asked Collins if it was "that same stuff" from the night Ally overdosed, and Collins (not knowing Ally had passed away) confirmed it was. With that, the officers stepped in, seized the heroin bundle, and arrested Collins. A Drug Enforcement Agency laboratory tested samples from those Butter bags and determined that, like the Butter bag tested from Ally's room, they contained fentanyl and heroin. Yet unlike the samples taken from the bedroom, the lab performed a quantitative analysis on these drugs and concluded that fentanyl was "the most substantial portion of the substance within that mixture."

Collins agreed to cooperate with the police and explained that he had obtained the Butter-stamped heroin from Donte Jacobs. The latter had approached Collins about dealing his heroin at the end of February or beginning of March 2016. By mid-March, Jacobs became Collins' only heroin supplier after Collins received positive "customer feedback" on Jacobs' heroin. Under their arrangement, Jacobs gave pre-packaged bags to Collins, who then sold them to users like Ally. According to Collins, Jacobs knew that he was selling heroin in Delaware, and Collins even gave him "customer feedback" from time to time.

Jacobs was eventually arrested for distributing the drugs that killed Ally, and he opted to go to trial. …

At trial, Kane, Collins, and the various police officers involved in the investigation testified. A forensic pathologist, Dr. Daniel Brown, also testified and explained that, based on his autopsy of Ally, she died of a drug overdose—specifically, "acute multiple drug intoxication." A forensic toxicologist, he said, would have to "determine which drugs caused the most damage." The forensic toxicologist, Dr. Michael Coyer, then testified that most drugs in Ally's system were at or on "the low side" of therapeutic levels. But the fentanyl dosage in her blood stream was "ten times higher than

> what would be the reported therapeutic range." It was, in fact, a "lethal level of fentanyl." "[B]ut for the use of that substance that contained fentanyl," Coyer explained, Ally "would not have died."
>
> Coyer also noted that the postmortem performed on Ally established that her blood was "consistent with someone who died from a substance contained in the Butter bag" the lab had tested. He recognized, though, that this conclusion rested on the lab's determination that the Butter bag—like Ally's blood sample—contained heroin *and* fentanyl. He did not know the concentrations of heroin or fentanyl in the tested bag because the lab only performed a qualitative analysis. His analysis also did not address the possibility that the Viking or Bulldog bags caused Ally's death, as no Viking bags were tested and the sample Bulldog bag only contained heroin.

*United States v. Jacobs*, 21 F.4th 106, 109–11 (3d Cir. 2021) (citations and footnotes omitted) (cleaned up). The jury convicted Movant of: (1) conspiracy to distribute and/or possess with the intent to distribute fentanyl and heroin resulting in death; and (2) distribution of fentanyl and heroin resulting in death. *See id.* at 111. Movant pled guilty to the severed charge of being a felon in possession of a firearm. *See id.* at 111 n.6. I effectively sentenced Movant to twenty-four years of imprisonment. (D.I. 80).

After sentencing, Movant appealed. Although the Third Circuit remanded for correction of a technical error in the sentence, it affirmed the conviction. *See Jacobs*, 21 F.4th at 117. Notably, the Third Circuit held that the evidence was sufficient to convict Movant under the plain error standard and stated it would also be sufficient under normal review.[1] *See id.* at 112.

On April 4, 2022, I re-sentenced Movant to twenty-four years of imprisonment. (D.I. 96). The § 2255 Motion pending before the Court was timely filed on April 12, 2023. (D.I. 102).

---

[1] Although Judge McKee concurred in the judgment *dubitante* regarding the sufficiency of the evidence, he nevertheless agreed with the conclusion that the evidence was sufficient to uphold the conviction. *See id.* at 117-22.

## II. RELEVANT LEGAL PRINCIPLES

Pursuant to § 2255, a federal prisoner serving a sentence imposed by a district court may move the sentencing court to vacate, set aside or correct a sentence claiming that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[.]" 28 U.S.C. § 2255(a). Ineffective assistance of counsel ("IAC") claims may be brought in a § 2255 proceeding regardless of whether the claims could have been raised on direct appeal. *See Massaro v. United States*, 538 U.S. 500 (2003).

IAC claims are reviewed pursuant to the two-pronged standard established in *Strickland v. Washington,* 466 U.S. 668 (1984). Under the first ("performance") prong of the *Strickland* standard, a movant must demonstrate that "counsel's representation fell below an objective standard of reasonableness," with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance. *E.g.*, *id.* at 688, 690. Although not insurmountable, this standard is highly demanding and leads to a strong presumption that counsel's representation was professionally reasonable. *See, e.g.*, *id.* at 689. Under the second ("prejudice") prong of the *Strickland* standard, a movant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See, e.g.*, *id.* at 694. A court can choose to address the prejudice prong before the performance prong and can reject an IAC claim solely on the ground the movant did not satisfy one of the prongs. *See, e.g.*, *Strickland,* 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance of counsel claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

## III. DISCUSSION

In his § 2255 Motion, Movant asserts that trial counsel "failed to do anything to pursue the flaws in the Government's case." (D.I. 102 at 13). Specifically, Movant claims trial counsel was ineffective because he: (1) "failed to pursue the defense that other drugs besides those contained in the 'BUTTER' bags [caused Ally's death];" and (2) "neither investigated, pursued, nor argued the essential question in dispute on whether Mr. Jacobs had delivered the drugs resulting in Ally's death." (*Id.*). In the "Factual Background" section of his Motion, Movant states that trial counsel "failed to secure independent testing of any of the bags found in Ally's apartment," "failed to retain a toxicology expert," "failed to present a theory that anyone else besides Mr. Jacobs was responsible for Ally's death,"[2] and "failed to argue to the jury any of the faults in the toxicological evidence." (*Id.* at 12). For the following reasons, the Court finds that Movant has failed to demonstrate that counsel's representation fell below an objective standard of reasonableness.

### A. Trial Counsel's Alleged Failure to Pursue the Defense That Drugs Other Than Those in the "Butter" Bags Caused Ally's Death

Movant claims that trial counsel failed to pursue the defense that drugs other than those in the "Butter" bags caused Ally's death. Review of the trial transcripts, however, belies this assertion. During cross-examination of various witnesses, trial counsel called attention to the fact that the "Bulldog" and "Viking" bags and syringe filled with a brown substance were all found in Ally's bedroom. *See* D.I. 62 at 54-57 (underscoring presence of "Viking" and "Bulldog" bags and syringe containing brown substance in Ally's bedroom during cross examination of Corporal Versagli); D.I. 62 at 106-08 (highlighting presence of syringe containing brown substance during

[2] This allegation appears to be the same as Movant's second IAC claim that trial counsel "neither investigated, pursued, nor argued the essential question in dispute on whether Mr. Jacobs had delivered the drugs resulting in Ally's death."

cross-examination of Sergeant Cowdright); D.I. 63 at 128-30 (pointing out untested wrappers stamped with "wolf…with [l]ittle helmet" and syringe filled with brown substance were found in bedroom during cross examination of Dr. Coyer).

During its closing, the Government acknowledged that trial counsel argued that the other drugs caused Ally's death: "So I understand the defendant's attorney asked questions about some of the other bags or the other stamps." (D.I. 63 at 189). The Government then argued against the claim that drugs other than those in the "Butter" bags caused Ally's death by asserting that the evidence in the room and toxicology did not support that theory.[3] (*Id.*).

During closing argument, trial counsel's general theme was sloppy investigation and unreliable civilian witnesses made for reasonable doubt. (D.I. 63 at 191-99). Counsel recounted that the "Viking" and "Bulldog" bags and the syringe containing the brown substance were all found in Ally's bedroom. (*Id.* at 193-94) He further elaborated, "The evidence that was there, the wrappers that had residue, the cap that had residue, the syringe with apparent drugs inside wasn't tested." (*Id.* at 194).

Accordingly, the record supports a finding that trial counsel did, in fact, pursue the defense that drugs other than those in the "Butter" bags could have caused Ally's death.

### B. <u>Trial Counsel's Alleged Failure to Investigate, Pursue or Argue Whether Movant Delivered the Drugs Resulting in Ally's Death</u>

Movant alleges that trial counsel was ineffective because he did not investigate, pursue, or argue whether Mr. Jacobs had delivered the drugs resulting in Ally's death. Again, Movant incorrectly characterizes trial counsel's conduct. Counsel cross-examined Collins regarding whether he had sold either the "Bulldog" or "Viking" bags. (D.I. 62 at 263-64). Collins could not

---

3 The Viking bags were empty. One of the Bulldog bags was tested and contained only heroin.

remember if he had, stating he "sold so many different stamps." (D.I. 62 at 263-64). In closing argument, trial counsel then specifically questioned, "where did those other drugs come from?" (D.I. 63 at 193). Trial counsel suggested that Kane could have gotten the drugs from someone else. (D.I. 63 at 194). He argued that Collins could have added the fentanyl to the heroin himself. (D.I. 63 at 196). Trial counsel argued that the Government was relying upon Collins (an individual subject to credibility challenge) to identify Movant as the person on the other end of the FaceTime calls made by Collins, in cooperation with the police, which calls were used to incriminate Movant. (D.I. 63 at 195; *see* D.I. 62 at 183-85, 224, 226-246, 248-255). Trial counsel similarly argued that someone other than Movant could have taken the Uber rides used as evidence to place Movant at a location that Collins testified he usually met with Movant. (D.I. 63 at 197-98; *see* D.I. 62 at 255-56; D.I. 63 at 22-29). As pointed out in the Government's closing argument, defense counsel repeatedly argued that "someone else" was the heroin source for the drugs resulting in Ally's death. (D.I. 63 at 202-03). For these reasons, the Court finds that trial counsel did pursue and argue whether Movant was the person who delivered the drugs resulting in Ally's death.

In the "Factual Background" section of the Motion, Movant states that trial counsel failed to secure independent testing of any of the drugs found in Ally's apartment, failed to retain a toxicology expert, and failed to argue to the jury any of the faults in the toxicological evidence.[4] (D.I. 102 at 12). As best the Court can tell, these allegations were raised, at least in part, to support Movant's claim that trial counsel failed to investigate whether Movant delivered the drugs resulting in Ally's death. These allegations, however, are conclusory and insufficient to demonstrate ineffective assistance of counsel. *See United States v. Thomas*, 221 F.3d 430, 437 (3d

---

4 These claims were listed in Movant's "Factual Background" and appear to be raised in support of his two enumerated IAC claims. Even if intended as stand-alone claims, however, the Court's analysis and conclusion remain the same.

Cir. 2000) (noting Third Circuit precedent that vague and conclusory allegations in § 2255 motion may be disposed of without further investigation by District Court); *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 298 (3d Cir. 1991) (holding vague and conclusory allegations are insufficient to meet burden of proving IAC). Movant does not indicate how independent testing or retaining a toxicology expert would have helped his case. These grounds are purely speculative and, therefore, insufficient to demonstrate IAC. *See Zettlemoyer*, 923 F.2d at 298 (holding habeas petitioner failed to meet burden of showing counsel's representation fell below "objective standard of reasonableness based on vague and conclusory allegations that some unspecified and speculative testimony might have established his defense"); *Chambers v. Sec'y Pa. Dep't of Corr.*, 442 F. App'x 650, 654 (3d Cir. 2011) (holding "[w]hatever counsel may have gained by testing was and remains speculative (and thus, the claim fails under *Strickland*)").

Furthermore, there is no authority requiring counsel to have independent testing done on evidence to provide effective representation. *United States v. Nguyen*, 379 F. App'x 177, 181 (3d Cir. 2010). Whether to independently test evidence is a strategic decision, which is given "a heavy measure of deference." *See Strickland*, 466 U.S. at 691. In rejecting an IAC claim, the Third Circuit has held that trial counsel, who focused on the prosecution's lack of evidence, had an "affirmative, strategic reason" not to seek independent testing, the outcome of which was speculative and could have inculpated the defendant. *See Chambers*, 442 F. App'x at 654 (holding "[w]hatever counsel may have gained by testing was and remains speculative (and thus, the claim fails under *Strickland*) and may well have inculpated [petitioner], in which case there was an affirmative, strategic reason not to seek it"); *see also Harrington v. Richter*, 562 U.S. 86, 109 (2011) (finding that "[t]o support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty

that exonerates"); *Curry v. Sec'y, Fla. Dep't of Corr.*, 735 F. App'x 609, 612 (11th Cir. 2018) (holding counsel's decision to not pursue testing and instead use lack of testing strategically constituted reasonable professional performance, especially considering testing did not have reasonable probability of exonerating defendant). Upon review of the trial testimony and closing argument, it is clear that Movant's trial counsel used the Government's failure to do more extensive testing as a defense. With the prosecution having the burden to prove its case beyond a reasonable doubt, it is a more than reasonable strategy for defense counsel to call into question the sufficiency of the prosecution's case. Furthermore, although Movant does not specify any particular testing that should have been performed, the results potentially could have further implicated him – for example if all the "Butter" bags contained both heroin and fentanyl but none of the other drugs found in the bedroom contained fentanyl.

Movant does not describe precisely what is meant by "faults in the toxicological evidence." In his "Factual Background," Movant states that: (1) drugs other than the "Butter" bags were found in Ally's bedroom; (2) the "lab conducted minimal testing;" (3) only one of the fifty-two "Butter" bags found in the room was tested and only to "determine *whether* they contained fentanyl – not how much;" (4) the "toxicologist admitted that he … would want to know not just that fentanyl was present in the heroin but also how much;" and (5) "Ally had at least one other source of drugs besides the dealer who got his drugs from" Movant. (D.I. 102 at 11-12). The record again refutes Movant's claim that trial counsel failed to address any of these alleged "faults in the toxicological evidence." As previously discussed, trial counsel brought out the presence of other drugs in Ally's bedroom. *See* Section III.A. Trial counsel emphasized that, other than one "Bulldog" bag, none of those other drugs were tested. *See* D.I. 62 at 106-08 (cross-examining Sergeant Cowdright to highlight that empty drug wrappers and syringe with brown residue were

not tested); D.I. 63 at 128-29 (identifying evidence that was not tested during cross examination of Dr. Coyer); D.I. 63 at 194 (reiterating during closing argument that wrappers with residue and syringe were not tested). Trial counsel also cross-examined Dr. Coyer regarding the fact that the sample "Butter" bag tested from those found at the scene was tested only for the presence of fentanyl, but not how much. (D.I. 63 at 124-25 (referencing direct examination regarding testing of "a sample bag marked 'BUTTER'")). Furthermore, Movant's claim regarding the toxicologist "admitting" he would want the quantitative analysis only further exemplifies that trial counsel pursued this issue because this admission occurred as a result of counsel's cross-examination. (D.I. 63 at 124-30). Finally, Movant has not provided, nor has the Court discovered, any evidence indicating Ally had a dealer other than Collins. Nevertheless, as discussed on page eight, trial counsel argued that someone other than Movant could have been the source of the drugs that killed Ally.

The Court, therefore, finds that Movant's claim that trial counsel failed to investigate, pursue or argue whether Movant delivered the drugs resulting in Ally's death does not overcome the strong presumption that counsel's representation was professionally reasonable.

### C. Conclusion

For the foregoing reasons, the Court finds Movant has failed to demonstrate that trial counsel's representation fell below an objective standard of reasonableness. Having found that Movant's IAC claims fail under *Strickland*'s performance prong, there is no reason for the Court to make a determination on the prejudice prong.

## IV. EVIDENTIARY HEARING

A district court is not required to hold an evidentiary hearing on a motion filed pursuant to 28 U.S.C. § 2255 if "the motion and the files and records of the case conclusively show" that the movant is not entitled to relief. 28 U.S.C. § 2255(b); *see also United States v. Dobbin*, 147 F.4th

333, 342 (3d Cir. 2025); *United States v. Booth*, 432 F.3d 542, 545-46 (3d Cir. 2005); Rule 8(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts. If the record conclusively negates the factual predicate asserted in support of a § 2255 motion, or if the movant would not be entitled to relief as a matter of law even if the factual predicates as alleged in the motion are true, an evidentiary hearing is not required. *See Gov't of Virgin Islands v. Nicholas*, 759 F.2d 1073, 1075 (3d Cir. 1985). The Court concludes that an evidentiary hearing is not warranted because, as previously discussed, the record conclusively establishes that Movant is not entitled to relief under § 2255.

## V. CERTIFICATE OF APPEALABILITY

A district court issuing a final order denying a § 2255 motion must decide whether to issue a certificate of appealability ("COA"). See Rule 11 of the Rules Governing Section 2255 Proceedings; 3d Cir. L.A.R. 22.2 (2011). A COA is appropriate only if the movant "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make that showing, a movant "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The Court is denying Movant's § 2255 Motion as meritless. Reasonable jurists would not find the Court's assessment debatable or wrong. Therefore, the Court will not issue a certificate of appealability.

## VI. CONCLUSION

For the reasons discussed, the Court denies Movant Donte Jacobs' § 2255 Motion without holding an evidentiary hearing or issuing a certificate of appealability. An appropriate Order will be entered.